Argued June 10, affirmed July 22, 1959

# McGUIRE *v.* BROWN

342 P. 2d 774

*Jerome S. Bischoff,* Portland, argued the cause for appellant. With him on the brief was James J. Kennedy, Portland.

*Eldon F. Caley,* Roseburg, argued the cause for respondent. On the brief were Long, Neuner & Dole, Roseburg.

Before McAllister, Chief Justice, and Rossman, O'Connell and Crawford, Justices.

CRAWFORD, J. (Pro Tempore).

Plaintiff sued defendant for damages due to personal injuries sustained through the alleged negligence of the defendant's employee, Charles O. Dennis. At the time of the accident plaintiff was employed by the Umpqua Plywood Corporation as its timber department manager, and defendant was an independent logging contractor.

Defendant challenged plaintiff's right to maintain a third party action, asserting plaintiff's sole remedy was under the Workmen's Compensation Law. ORS

656.154. Both Umpqua Plywood Corporation and defendant were operating under the compensation act and subject thereto. The trial judge, proceeding under ORS 656.324(3), decided the issue thus raised against the plaintiff, holding the action barred, and entered findings, conclusions and judgment in favor of defendant, from which plaintiff appeals. Plaintiff poses the following as the questions presented by this appeal: (1) Were the injured workmen, plaintiff McGuire, and the employee of the defendant who caused the injury, namely, Dennis, a faller, on the same "premises" within the meaning of the statute? (2) Did the two employers have joint supervision and control of the premises? (3) Were the two employers engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation?

"(1) If the injury to a workman is due to the negligence or wrong of a third person not in the same employ, the injured workman, or if death results from the injury, his widow, children or other dependents, as the case may be, may elect to seek a remedy against such third person. However, no action shall be brought against any such third person if he or his workman causing the injury was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman and was an employer subject to ORS 656.002 to 656.590.

"(2) As used in this section, 'premises' means the place where the employer, or his workman causing the injury, and the employer of the injured workman, are engaged in the furtherance of a common enterprise or the accomplishment of the same or related purposes in operation." ORS 656.154.

Little difference of opinion exists as to either law

or fact. It is the application of the law to the facts that presents our problem.

The facts are these: On April 20, 1954, Umpqua Plywood Corporation purchased timber from the United States Department of Agriculture Forest Service. This eighty-two-acre tract was known as the Clover Ridge sale. Umpqua was obligated to cut and remove all the timber by December 31, 1955. Umpqua contracted to construct, according to Forest Service specifications, a main access road into the sale area and to maintain and repair all roads constructed by it and used for log hauling or other purposes in the area. Maintenance and repairs to be done according to standard required by the Forest Supervisor. On June 10, 1954, Umpqua entered into a contract with defendant, by which defendant agreed to fall, buck, yard, load and deliver the logs produced from the Clover Ridge sale area to Umpqua's millsites. The contract between Umpqua and the Forest Service was made a part of the contract between Umpqua and defendant. Umpqua agreed to construct the required main access road into the area and defendant agreed to keep it in repair and to construct all other roads necessary for proper logging at his own expense, and on completion of the logging contract to condition the road so as to be acceptable to the Forest Service. The contract between the United States and Umpqua located the main access road Umpqua had agreed to construct and which was to be completed in a manner satisfactory to the Forest Service Supervisor before timber could be removed thereover. A part of this main access road had been completed by Umpqua at the time of the execution of the contract with defendant. The construction continued thereafter.

In late 1954 Umpqua had begun construction of

the main access road, and in December 1954 defendant began his logging operations in the area. May 9, 1955, Umpqua was finishing the upper portion of the Clover Ridge main access road and was preparing the main access road for inspection by the Forest Service, preparatory to turning it over to defendant for his use. Both logging operations and road construction proceeded at the same time. The Umpqua-Forest Service contract required a dirt road, only, and Umpqua was under no obligation to defendant Brown to rock the road, though rock was required to stabilize for the winter use Brown intended to make of it. Brown was required to log continuously.

On May 9, 1955, McGuire and Brown entered the area to determine the suitability of rock which Brown proposed to use on the lower portion of the road; inspected it, and returned to the site where the road crew was working, and stopped to talk to Shelton, Umpqua's foreman. While so conversing, a tree was felled by Charles O. Dennis, a member of defendant's falling and bucking crew, striking both plaintiff and defendant. The stump of this tree was about 125 feet from the road, and the tree itself was about 160 feet long. It fell across the roadway. McGuire was charged with the responsibility of seeing that Umpqua performed its contract with the Forest Service and had the duty "to supervise the logging operations, including the duty to see that the independent contractors are performing their work properly." Two other employees of Umpqua worked in connection with defendant's logging operation. A "peeler picker", who marked and directed the destination of logs suitable for plywood manufacture, and a "bucker", who saw to it that logs were bucked in conformity with the contracts to obtain the maximum number of "peeler

grade logs." Operation "bucking" was subject to Umpqua's direction in this respect. The work of the logging and road crews was co-ordinated to eliminate danger from blasting and falling trees. A safety zone was maintained between the two operations when they were carried on simultaneously. Dennis, at the time of the accident, was falling timber in the safety area, contrary to defendant's practice and to Shelton's orders.

Let us first consider the origin of contractual responsibilities arising from the two contracts; the one between Umpqua and the Forest Service, the other between Umpqua and Brown, which adopted and incorporated the first. We consider such portions of these contracts as are relevant to this particular matter.

The Forest Service sales agreement, entered into between Umpqua and the Forest Service, describes the timber and provides that:

> "Period of Contract.—3. * * * all timber shall be cut and removed and the requirements of this agreement satisfied on or before December 31, 1955.
>
> *   *   *   *   *
>
> "Logging.—8. As far as may be deemed necessary for the protection of National Forests interests, the plan of logging operations on the sale area shall be approved by the Forest Supervisor or by the officer to whom he may have delegated authority to give this approval. Operations begun on any natural logging area shall be completed in accordance with the terms of this agreement before cutting may begin on other areas, * * *.
>
> *   *   *   *   *
>
> "LOGGING (Cont.)
>
> "Sec. *14—Control of Logging Plans.* Prior to initiating falling, and prior to January 1 of each

succeeding year, the purchaser shall submit to the forest supervisor for his approval a plan of logging showing the area in which logging operations will be conducted during the year and indicating the order of logging on the various units within that area. Logging operations shall follow this plan * * *.

    * * * * *

"Sec. 35. *Truck Roads.* The main road * * * shall be constructed by the purchaser * * *.

"The construction and reconstruction of the road into any cutting unit shall be completed in a manner satisfactory to the forest supervisor before timber, other than timber cut in clearing road rights-of-way, may be removed from the cutting unit concerned.

    * * * * *

"(1) *Maintenance of Roads Constructed or Reconstructed by the Purchaser*: [from which it appears the Forest Service possessed and had right to control and supervise methods and plans of Umpqua and of any subcontractor in cutting and removing the timber]."

The Umpqua-Brown contract obligated Brown to log, buck, yard and deliver to Umpqua's mill ponds or mills the timber in question. Brown agreed to perform all conditions in the Forest Service-Umpqua contract, save as to payment. Brown agreed to begin at once and complete logging and delivery not later than June 30, 1955. The contract continued: "All peelable logs shall be delivered to Umpqua's mill pond, Green Station, Oregon. * * * Umpqua shall have the right to maintain an employee on the landing of the logger, who shall pick and select peeler and peelable logs and who shall designate the mill or mills to which said logs shall be delivered. Logger agrees to follow the directions of said employee in this regard. * * *"

Prior to beginning falling, Brown was to prepare a logging plan for the area, to be approved by the Forest Supervisor. Logging operations were to follow this plan. Roads built by Umpqua were to be turned over to Brown after construction and inspection.

*As to premises, common enterprise, related purposes.* Plaintiff argues that plaintiff McGuire and defendant's employee Dennis, who caused the injury, were not upon the same "premises" within the meaning of the statute "for the reason that the location of the faller Dennis in the woods and the location of the injured workman on the road were not the same, nor was either place the subject of joint supervision and control by the two employers nor a premise on which they were engaged in a common enterprise." And that the Workmen's Compensation Act was passed "to cover situations in which employees are compelled to intermingle by the exigencies of their trade, but not to situations in which they are required to be kept separate in point of place of work or time of occupancy of such place of work."

> "* * * Clearly, the term 'premises' should not be confined within a small perimeter, but should be extended to the entire area where the work was in progress. The Act deals with practical matters, and its phraseology should receive practical construction. * * *" *Kosmecki v. Portland Stevedoring Co.,* 190 Or 85, 94, 223 P2d 1035.

And from *Inwall v. Transpacific Lumber Co.,* 165 Or 560, 571, 108 P2d 522:

> "* * * To become 'engaged in the furtherance of a common enterprise' it is not essential that the workmen formally enter into an agreement to that effect. All that is essential is that

they occupy the same premises and perform component parts of a general undertaking. * * *''

See, also, *Hensler v. City of Portland*, 212 Or 28, 34, 318 P2d 313.

"Premises" may not be given the circumscribed meaning suggested by plaintiff. *Johnson v. Timber Structures, Inc.,* 203 Or 670, 281 P2d 723. Where were the parties engaged in the "furtherance of a common enterprise or the accomplishment of the same or related purposes in operation"? It was the sale area wherein they were performing their contracts and discharging their responsibilities, and they were not restricted to the ground on which they stood. We may not limit the premises to the road, the rock outcropping or the tree felled by Dennis. The work was in progress within that area and the two employers were furthering a common enterprise and accomplishing related purposes. The construction of the roadway was essential to the logging operation. Both were constituent elements of the two contracts, the Umpqua-Forest Service contract and the Umpqua-Brown contract, which incorporated the former.

As one of the "Practical matters" referred to in the Kosmecki case, supra, it would seem impossible to break down into segments the phases of this operation and attribute to one the quality that would recognize the right to sue the third party and to the other the sought immunization. The operation, responsibilities, the commitments, the functional incidents, and contributions to objectives sought, must all be considered in determining the "premises". And so considered, and as a "practical matter", it would seem to follow the area of this operation as contracted and contemplated by the parties would be coextensive with

the area of exercise of the common enterprise. It may not be restricted to the spot occupied by Dennis when falling the tree and that on which plaintiff stood at the time of the accident.

*As to joint supervision and control.* Here we have a situation wherein employees were compelled to intermingle to a degree "by the exigencies of their trade" and the discharge of their mutual responsibilities, though conscious effort was made to avoid the potentially dangerous situation. The road building and the logging proceeded and was intended to proceed almost simultaneously, though contemplating a "safety zone" for mutual protection. The work was co-ordinated to avoid mutual occupational hazards. The parties were necessarily thrown together, though effort was made to avoid it. A practical evaluation of the situation discloses one fraught with danger. This combined operation for its effective prosecution required joint supervision and control. There was a necessary intermingling; the parties co-operated in the interests of safety and efficiency; Shelton removed Dennis from the danger area; McGuire and Brown inspected the rock for road use on winter hauling; they co-operated with respect to work schedules and plans. There was an interlocking contract to perform the same undertaking. The practical performance of the contracts suggests joint supervision and control as indispensable to safe, economical and efficient operation.

The basic commitments of the two employers derived from the Umpqua-Forest Service contract and the Umpqua-Brown contract. The same timber was covered; mutual obligations were imposed on both Umpqua and Brown; submission of logging plans and approval; inspection to see observance; the time stipulated for removal of the timber; requirement that

Brown comply with the Umpqua-Forest Service contract. These contracts formed the basis for the common enterprise and stated a joint obligation in their performance, with joint supervision and control in its larger aspect. The parties had joint supervision and control over premises where they were engaged in a common enterprise or the accomplishment of the same or related purposes in operation and performed components parts of a *general* undertaking. *Inwall v. Transpacific Lumber Co.*, supra. This operation and the performance of the contracts would be impossible without joint supervision and control. Here we have interlocking contracts looking to the same end—the logging of the area and the building of roads for removal of logs to mills. The parties shared a joint responsibility for the road-building operation and the logging as well. They *had* joint supervision and control over the premises. Joint supervision and control obviously does not imply that each employer shall have the right to dictate to the other the manner in which he shall discharge his particular phase of the joint operation; merely that in the functioning of each in his own field in its relation to the other, the relationship and discharge of responsibilities required such joint supervision and control, which in fact, existed, and involved an active participation in the work at hand. *Claussen v. Ireland,* 216 Or 289, 338 P2d 676. Did they have joint supervision and control over the area when we regard their relationship to the entire project and the contribution they were required to make to the over-all operation? We are not so much concerned with respect to joint supervision and control over the particular work, as to its aspect to the entire operation; a joint control and supervision over premises, the place where the common enterprise

is in progress, i.e., the logging and road-building necessary in the discharging of the contracts. We are not here considering an independent road-building operation and an independent logging operation, each divorced from the other, but a combined logging and road-building operation, and joint supervision and control was inevitably necessary, was contemplated, provided for, and existed in fact, and without which the contracts would be meaningless, so far as effective execution thereof is concerned. *Johnson v. Timber Structures, Inc.,* supra.

We conclude this third party action will not lie under ORS 656.154.

Affirmed.

O'CONNELL, J., dissenting.

I am of the opinion that the plaintiff is entitled to bring a third party action in this case.

Unquestionably both the defendant and the Umpqua Plywood Corporation had as their common aim the removal of timber from the same premises and in this sense they were engaged in a "common enterprise." And it is true, as the defendant points out, that Umpqua exercised surveillance over the defendant's operation as it did with those of other independent contractors who were engaged in the logging operation. But neither the common purpose nor the surveillance exercised by Umpqua brings the activities of Umpqua and the defendant together so as to constitute joint supervision and control over the premises within the meaning of ORS 656.154.

It is agreed that the simultaneous activity of the employes of two or more employers on the same premises is not in itself sufficient to make the operation

a common enterprise. Nor is it enough that they are both engaged in the operation to produce the same final objective as, for example, the removal of timber from the same tract of land. The fact that they work with an identity of interests in a common *result* is not enough; their common interest must also draw them into a *physical* relation wherein the physical efforts of their employes are combined to accomplish a particular job on the premises. As taught in the opinion of Justice Tooze in *Johnson v. Timber Structures, Inc.*, 203 Or 670, 281 P2d 723 (1955), ORS 656.154 is to be construed to mean that there must be joint supervision and control "of the particular work at hand," or more specifically "active participation in and control over the particular work being done." Supra at p 683.

There was not such supervision and control in that sense in the present case. Certainly the employes were brought together on the premises in furtherance of a general objective. But each was engaged in a separate operation. Each operation gave rise to certain risks to the employes engaged in it. Because the employes of both Umpqua and the defendant were on the same general premises the employes of one were exposed to risk created by the separate activities of employes of the other. But recovery in a third party action for an injury resulting from such activities is not barred by ORS 656.154. The injury must arise out of a hazard created by the joint participation of the employes in carrying out a particular task. Such an injury did not occur in the present case and the plaintiff should have been permitted to maintain his action against the defendant.

The majority opinion construes the statute strictly against the employe; the construction should be in

his favor. *Johnson v. Timber Structures, Inc.,* supra. A workman should not be deprived of his common law right to bring an action unless the facts fall clearly within the statute. They do not in this case. Therefore, I dissent.