Argued October 5, 1960, reargued January 11, reversed and
remanded January 25, 1961

# THOMAS *v.* FOGLIO
358 P. 2d 1066

*Gordon G. Carlson,* Roseburg, argued the cause for appellant. With him on the briefs were Yates, Murphy & Carlson, Roseburg, and Clifford S. Beckett, Oregon City.

*James O. Goodwin,* Oregon City, argued the cause for respondent. On the brief were Jack, Goodwin and Santos, Oregon City, and Philip A. Levin, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and LUSK, Justices.

O'CONNELL, J.

Plaintiff brought this action to recover damages resulting from the alleged violation of the Employers' Liability Law, ORS 654.305. The jury returned a verdict in favor of plaintiff, but a judgment notwithstanding the verdict was entered. Plaintiff appeals.

Plaintiff, an employee of the Elk Creek Logging Company, was injured while loading logs on defendant's log truck. Elk Creek Logging Company was covered under the Workmen's Compensation Act; defendant was not. Plaintiff recovered compensation from the State Industrial Accident Commission and then brought this third party action as provided by ORS 656.154.

At the time of the accident plaintiff was employed by Elk Creek Logging Company as a loader. His job consisted of removing the tongs from the logs after they had been loaded onto the truck. This required him to be on the top of the load. When plaintiff was removing the tongs from a log which had just been hoisted to the truck, the log started to roll. Plaintiff,

to avoid being struck, jumped onto the top of a water tank located immediately behind the truck cab. His calked boots slid on the metal surface of the tank and he fell to the ground injuring his knee.

Plaintiff's complaint contained allegations sufficient to charge defendant with a violation of the Employers' Liability Law, specifically defendant's failure to provide a safe platform on the top of the water tank as a refuge from danger for plaintiff during the loading operation. Defendant's answer raised the issues of his negligence, his status as an employer, and the defenses of assumption of risk and contributory negligence. The defendant moved for a directed verdict on the following grounds: (1) that defendant was not an employer within the meaning of the Employers' Liability Law; (2) that defendant did not have control over the instrument involved as contemplated under the Employers' Liability Law, and (3) that there was insufficient evidence of negligence as charged to warrant submitting the matter to the jury. The motion was denied and the case was submitted to the jury. A verdict was returned for plaintiff in the amount of $18,452.75, for which judgment was entered. Defendant then moved for a judgment notwithstanding the verdict, which motion was granted. This appeal is taken from the latter judgment.

Plaintiff first attacks the judgment n.o.v. for the reason that although the motion for the judgment n.o.v. was made on the general ground that the court should have granted defendant's motion for a directed verdict, still, plaintiff contends that the motion for judgment n.o.v. was granted on specific grounds not set forth in the motion for the directed verdict, relying upon *Ingalls v. Isensee*, 170 Or, 393, 133 P2d 614 (1943); *Allister v. Knaupp*, 168 Or 630, 126 P2d 317 (1942)

and ORS 18.140. It is our opinion that the grounds which were stated in the defendant's motion for a directed verdict are essentially the same grounds as those recited in the motion for a judgment n.o.v. Therefore, this assignment of error is without merit.

The principal question on this appeal is whether the trial court was correct in deciding as a matter of law that defendant was not an employer under ORS 654.305, commonly referred to as the "and generally" clause of the Employers' Liability Law. ORS 654.305 provides in part that "Generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employes or the public, shall use every device, care and precaution which it is practicable to use * * *."

The trial court held that, "There being no evidence that the defendant either had charge of or was responsible for the work of loading or hauling the logs, there is no basis under the Act for holding him responsible."

■ It is now well established that to entitle a person to recover under this section he must prove that he is an employee. *Byers v. Hardy*, 216 Or 42, 337 P2d 806 (1959); *Drefs v. Holman Transfer Co. et al.*, 130 Or 452, 280 P 505 (1929); *Saylor v. Enterprise Electric Co.*, 106 Or 421, 212 P 477 (1923); *Hornschuch v. Southern Pac. Co. et al.*, 101 Or 280, 203 P 886 (1921); *Turnidge v. Thompson*, 89 Or 637, 175 P 281 (1918). It is equally well established that he need not be an employee of the defendant who is charged with a violation of the Act. *Myers v. Staub*, 201 Or 663, 272 P2d 203 (1954); *Byers v. Hardy*, supra; *McKay v. Pacific Building Materials Co.*, 156 Or 578, 68 P2d 127 (1937); *Coomer v. Supple Investment Co.*, 128 Or 224, 274

P 302 (1929); *Rorvik v. North Pac. Lumber Co.*, 99 Or 58, 190 P 331, 195 P 163 (1920). Although the section does not expressly so provide, the defendant must be an employer in some sense before the statutory duty will arise. *Snodgrass v. Risley*, 196 Or 506, 250 P2d 392 (1952); *Gray v. Hammond Lumber Co. et al.*, 113 Or 570, 232 P 637, 233 P 561, 234 P 261 (1925).

■ At the juncture where we held that a plaintiff could recover under the Employers' Liability Law against one who did not directly employ him, the word "employer" took on a special and broader meaning embracing situations in which the defendant would not be considered an employer of the plaintiff workman as that term is ordinarily understood. The treatment of the defendant as the employer of one whom he has not *directly* employed to do the work out of which the injury arises can be justified on the ground that the plaintiff becomes the defendant's employee in the sense that the plaintiff is performing work on a project of which defendant's operations are an integral part. The plaintiff becomes, in effect, an adopted employee to carry out the work project in which plaintiff's actual employer and his adoptive employer are participating. To draw the defendant into the employer-employee relationship in this sense, it must be shown that the defendant was one "having charge of, or responsible for the work." ORS 654.305.

■ It would seem clear that one who merely sells equipment which is intended for use and is used by workmen and who, after the sale, is not involved in the use to which the equipment is put, is not an employer under the Act. In *Clayton v. Enterprise Electric Co.*, 82 Or 149, 161 P 411 (1916), the Act was extended to include a supplier of electricity where an injury was incurred by an employee of defendant's customer who

came in contact with a defective switch owned by the customer but which was subject to some "control" by the defendant. We need not now decide whether the court was correct in treating the defendant within the meaning of the Act as a person "having charge of, or responsible for" the work performed by the plaintiff employee. At this point we simply wish to note that one who merely supplies equipment which is to be used in the course of plaintiff's employment is not an employer under the Employers' Liability Law. This is also true where the equipment is leased rather than sold. The Act cannot apply unless in some sense the defendant has "charge of" or is "responsible for" the work out of which the injury arose. The defendant must participate in the enterprise in some way. The difficult problem is to determine what is meant by "participation." A similar problem is presented in the application of ORS 656.154. Under that section, an employee of an employer who is covered by the Workmen's Compensation Act (ORS ch 656) may recover against a third person unless that third person is subject to the Act and he or his workman causing the injury "was, at the time of the injury, on premises over which he had joint supervision and control with the employer of the injured workman * * *."

■ Both ORS 656.154 and ORS 654.305 are cast in terms of the defendant's control over the work out of which the injury arises. We do not pass upon the question of whether the control required under each of these statutes is the same, but both statutes have been liberally construed to cover situations in which the defendant did not have actual control over the specific activity which was the immediate cause of the plaintiff's injury. Defendant's participation has been considered sufficient where it amounted to co-

operative conduct in accomplishing a task in which both the defendant and plaintiff's employer were interested. *Pruett v. Lininger,* 224 Or 614, 356 P2d 547 (1960) (considering the interworkings of ORS 654.305 and ORS 656.154); *Fisher v. Rudie Wilhelm Whse. Co.,* 224 Or 26, 355 P2d 242 (1960) (ORS 656.-154); *McKay v. Pacific Bldg. Materials Co.,* supra (ORS 654.305). Our prior decisions indicate that in construing ORS 656.154 this participation must be more than a common interest in an economic benefit which might accrue from the accomplishment of the task, *Pruett v. Lininger,* supra; *Fisher v. Rudie Wilhelm Whse. Co.,* supra; *Johnson v. Timber Structures, Inc.,* 203 Or 670, 281 P2d 723 (1955); the defendant or his employee and plaintiff's employer must actively join in a physical way in carrying on the particular work which produces the injury. *Johnson v. Timber Structures, Inc.,* supra. As expressed in *Pruett v. Lininger,* supra, there must be an "operational commingling" of the employees of the two employers. Similarly, in the application of ORS 654.305, it has been held that defendant cannot be held subject to the Employers' Liability Law unless it is shown that there was "an intermingling of duties and responsibility" of the employers involved in the enterprise. *Myers v. Staub,* supra. Or, as expressed in *Byers v. Hardy,* supra, "It is only those whose employment or duties require them to be about machinery of an employer other than his own or whose duties may require such person to expose himself in or about hazardous conditions or structures of such other employer which are prohibited or circumscribed by the Act." 216 Or at 48, 337 P2d at 809.

On the basis of the foregoing observations it would follow that if defendant had leased his trucks and

loaned his servant Beckgren, the truck driver, to Elk Creek Logging Company he would not have been within ORS 654.305. Furthermore, (and still assuming that defendant had leased the truck) even though Beckgren had remained defendant's employee, the Act would not be applicable because there was no evidence to prove that through Beckgren defendant was participating in the activity which caused the injury.

■ A more difficult question is presented if it is found that defendant was not a lessor of the trucks but was in the position of a contract hauler retaining control of the operation of his own trucks. In such a case there would be no question as to the fact that defendant did participate in the job of loading the truck at the time of the injury; obviously, without the truck the logs could not be loaded. But it would still be necessary to determine whether that participation was sufficient to bring defendant within the statutory description of "persons having charge of, or responsible for" the work. The record clearly shows that Beckgren, the truck driver, did not actually take part in the specific act of getting the logs on the truck, or in removing the tongs, or in doing any other act directly relating to the loading operation. As the trial judge stated in his memorandum opinion, "the driver was nothing more than a bystander insofar as the condition giving rise to the accident was concerned." If it had been shown that Beckgren's conduct, such as in moving the truck or in helping with the loading operation, had contributed as a cause of the injury, there would clearly be a basis for bringing defendant within the Act. Borrowing from the analysis in the cases interpreting ORS 656.154, it is clear that joint supervision and control "does not imply that each employer shall have the right to dictate to the other

the manner in which he shall discharge his particular phase of the joint operation." *McGuire v. Brown,* 217 Or 300, 310, 342 P2d 774 (1959). The Act applies "even though only one of the covered employers may be said to be in actual control of the site where the work is under way." *Pruett v. Lininger,* supra, 356 P2d at 551, relying upon *Nelson v. Bartley,* 222 Or 361, 352 P2d 1083 (1960). Although these cases hold that the defendant's employee need not have control over the specific acts which directly cause the injury, it should be noted that the defendant's employee had control in some sense over the activity in which he was engaged as a component part of the common enterprise. It can be said that an employer may be in "charge of" work within the meaning of ORS 654.305 even though he is in charge of an activity which forms only a component part of a common enterprise.

■ The narrower question presented to us in the case at bar (assuming that defendant was not a lessor of the trucks (is whether an employer can be regarded as "having charge of" work where the component part of the general undertaking for which he is responsible does not involve any risk-creating *activity* on the part of his employee but does call for the use of equipment over which he has control and which, if not maintained with proper safeguards, necessarily exposes the employees of the other employer to an unreasonable risk in the course of carrying on the common enterprise. In a narrow sense, it could be said that in such a case the defendant employer does not have charge of work but has charge only of equipment. But the word "work" in ORS 654.305 means more than the actual physical movement of the employees hired to perform a job; it means the entire enterprise with all of the component parts necessary to the completion

of the enterprise in which both employers have joined to accomplish. Thus in the instant case the defendant had "charge of" and was "responsible for" that part of the job or "work" which consisted of furnishing safe equipment to be used in a loading operation. And defendant's interest in the loading operation extended beyond the mere furnishing of adequate equipment; he was, as we shall develop more fully later, liable for all overloading fines, and consequently the manner in which the truck was loaded could affect him quite substantially.

What we have said here does not mean that a manufacturer, vendor, or a similar supplier, including a lessor of equipment is within the Act. The defendant must participate in the activity out of which the injury arose. *Warner v. Synnes et al.*, 114 Or 451, 230 P 362, 235 P 305, 44 ALR 904 (1925), relied upon by the dissent stands for this latter proposition. In that case it was shown that the defendant, West Oregon Lumber Co., had employed a contractor to construct a dock on defendant's premises. The plaintiff, an employee of the contractor, was injured when a defective rope attached to the scaffolding broke. It was alleged that the rope was furnished by the defendant lumber company but, as the court pointed out, there was "no testimony whatever to indicate that the company or any of its employees knew that the rope was to be used or was used by the plaintiff in the work." 114 Or at 457. Since the evidence also showed that the defendant did not in any other way participate in carrying out the work, the court held that defendant did not come under the Act.

The trial judge concluded from the evidence that the defendant was a lessor of the trucks used in Elk Creek Logging Company's operation and that defend-

ant retained no control over the loading or the hauling of the logs. Upon the basis of this conclusion the trial court entered the judgment n.o.v. We must determine from an examination of the record whether there was sufficient evidence from which the jury could conclude that defendant was not a lessor but rather, that he was an independent contractor employed to haul logs for Elk Creek Logging Company.

The record shows that Foglio was the owner of fifteen trucks. Two of them were used in Elk Creek's operation. Foglio was paid for such use on a per thousand foot basis. Both Beckgren, the truck driver, and Foglio received their pay for driving truck from Elk Creek. Foglio testified that he had no control over the loading operation, either as to when or where the trucks were loaded. He admitted that he was responsible for the repair of the trucks, and for the furnishing of any equipment necessary to their use, including the construction of a safety platform on top of the truck cab. Both Foglio and Beckgren were carried on Elk Creek's books as its employees and Elk Creek withheld from their wages the usual payroll deductions for workmen's compensation, unemployment compensation, social security and personal income tax. These deductions were not charged back against Foglio.

Mr. Briggs, an employee of Elk Creek produced as a witness in behalf of defendant, described the transaction between Elk Creek and defendant as a "two-check lease system," under which "all of the drivers are employees of the Company, whether they are the owner or just a driver, and the trucks are maintained, licensed, including PUC's by the owner of them." Apparently this arrangement, not uncommon in the lumber industry, was used to avoid payment of the federal

transportation tax, which was imposed by I.R.C. §§ 4271(a) and 4272 until its repeal in 1958. That tax is not payable where the owner of the cargo uses his own trucks or those held by him under a lease. Briggs testified that the Internal Revenue Service had recognized the company's so-called "two-check lease system" as a valid lease for the purpose of excusing it from the transportation tax.

Elk Creek and Foglio denominated their arrangement for the use of the trucks a "lease." However, whether the arrangement constitutes a lease or something less is not to be determined by the name the parties have given to it, but by determining whether, in fact, the legal relationship of lessor-lessee was created. That relationship was established only if legal possession of the truck passed to Elk Creek as lessee. Did possession pass from Foglio to Elk Creek? This presents a difficult question. The meaning of possession is one of the most troublesome conceptual areas of the law. The challenge of defining the term has brought essays from Holmes, Pollock and other eminent legal scholars. Bingham, The Nature and Importance of Legal Possession, 13 Mich L Rev 535 (1915); Holmes, The Common Law, pp 206-246 (1881); Pollock and Wright, Possession (1888); Salmond, Jurisprudence, §§ 93-107 (8th Ed 1930). The best analysis seems to leave us with the conclusion that "possession" has many meanings and that it "can only be usefully defined with reference to the purpose in hand." Shartel, Meanings of Possession, 16 Minn L Rev 611 (1932).

■ However, it is necessary to approach the question in a more direct and practical way. In determining whether a lessor-lessee relationship is created upon the transfer of a chattel the courts have looked to the manner in which the parties to the arrangement have

dealt with it. Generally, it is said that the right of control over the chattel is determinative. Where, as here, exclusive control in fact does not reside in the transferee alone, the question must be resolved by ascertaining which party has that measure of control of the equipment which the law regards as the more significant. This is ordinarily the function of the jury, guided by the court's instructions. It is our duty to aid the trial court in setting up these guides. Some of the factors to be considered in the case before us are (1) the employment relationship of the driver of the truck to Elk Creek and defendant; (2) the right to direct the movement of the truck; (3) the obligation to pay the costs of maintenance and repairs and to furnish necessary equipment; (4) the right to withdraw the truck from service; (5) the obligation to pay overload and other fines imposed by reason of the condition of the truck or load, and fines imposed upon the driver's operation of the truck; (6) the obligation to pay fuel costs; (7) the method of payment for the use of the truck; (8) the responsibility for garaging the truck; (9) the payment of insurance and license fees, and (10) the duration of the hauling arrangement.

The employment status of Beckgren was not clear. He was carried on the books of Elk Creek as its employee; he received his wages from Elk Creek; and Elk Creek withheld all of the usual payroll deductions, none of which were directly charged back to Foglio. Beckgren received his directions from Elk Creek as to when and where to haul. To comply with Elk Creek's contract with the union, Beckgren was required to become a union member. On the other hand, it is clear that Beckgren was regarded as Foglio's employee in all other respects. His employment originated with Foglio and he continued to serve as Foglio's employee

whenever Elk Creek was not operating. In other words, if he was Elk Creek's employee, he was a loaned employee. It appears that Beckgren's double relationship was a by-product of Elk Creek's effort to set up an arrangement by which to avoid the transportation tax. Apparently the effort was successful. We have examined Beckgren's status at this point simply as a part of the inquiry as to who had possession of the truck. From this standpoint it must be said that each of the parties to the arrangement had some control, Elk Creek over Beckgren's specific work activities in hauling logs, and Foglio over Beckgren in all other respects including the employment of Beckgren for other purposes.

It is important to note here, however, that Elk Creek's control over Beckgren represents only an incidental right of control over the truck, and it is the possession of the truck which is the controlling consideration in determining whether a lease arrangement was consummated. When we examine the matter from this standpoint, Foglio's control is clearly dominant. He testified as follows:

"Q Well, isn't it true that whatever equipment was on that truck you put on there, and whatever equipment was lacking from it was lacking because you hadn't put it on; in other words, no one else had any control over what was to go on that truck did they?

"A Well, I put on whatever was needed to be put on the truck to make it serviceable.

"Q That's my point. It was your truck, wasn't it?

"A Yes.

"Q And you were the sole one who had control of it, isn't that true? (pause)

"A To what extent do you mean?

"Q Well, I mean that to every extent. If the tires were old on it, they were your tires.

"A Yes.

"Q If the tires were to be replaced, you were the man who made the decision when they were to be replaced and you were the man who bought the tires.

"A Right.

"Q Isn't that true?

"A Yes.

"Q If something went wrong with the motor you decided whether it was to fixed with something new or whether it was to be fixed with something used or whether it wasn't to be fixed at all; isn't that correct?

"A That's right.

"Q And if there was to be a platform put on the top of the cab, you made that decision and you were the one who put it on or hired to have it put on.

"A That's right.

"Q And if there wasn't a platform there, there was no platform there because you hadn't decided to put one on, wouldn't that be true?

"A Yes.

"Q That would be the same with respect to anything that was done, with the water tank or anything else, with relation to the truck, wouldn't it?

"A Yes. (pause)

"*    *    *    *    *

"Q What about the servicing and the repairs of the truck? Did you have complete control of that?

"A Yes.

"Q And no one else had any control of it, did they?

"A No."

Foglio obtained and paid for the truck licenses and PUC permits. He paid the fines imposed for overloading. The most important indicia of his control was his right to substitute one truck for another. He testified:

"Q And isn't it a fact that you could take the truck off or put it back on at any time, or that you could sell the truck if you wanted to?

"A Well, I would have to give Elk Creek notice, tell them my plans.

"Q How much notice?

"A Well, gentlemen's agreement like we had in a lot of other things, would probably have been a couple of weeks. It also depends on the time of the year that it was.

"Q Well, in other words, you mean that just from a standpoint of being a good guy about it, you wouldn't decide to just go out and sell the truck and not have something there—to haul with without them knowing about it?

"A That's right.

"Q But you didn't have any legal obligation to haul for any period of time?

"A No, we had a gentlemen's agreement, is all."

We are aided in our present inquiry by adjudicated cases where the status of the hirer of motor vehicles is a controlling issue on the question of liability. The question of whether the rental of a motor vehicle creates a lease or simply a contract for hauling has been presented in numerous cases under the Motor Carriers Act. Some of these cases are reviewed in *State (PUC) v. O. K. Transfer Co.*, 215 Or 8, 330 P2d 510 (1958) and in *Brown v. Bonesteele*, 218 Or 312, 344 P2d 928 (1959). In *State (PUC) v. O. K. Transfer Co.*, supra, the problem of drawing the line between a lease and a hauling contract was stated by

quoting from *U.S. v. LaTuff Transfer Service*, 95 F Supp 375, as follows:

> "* * * 'The decisive question to be determined is how much service, if any, in addition to the vehicle alone, may be rendered to the shipper-lessee by the owner-lessor before the borderline between renting and leasing a truck for private carriage is crossed and the broad and all-inclusive field of transportation occupied.'" 215 Or at 26.

In the Bonesteele case we held that for the purpose of determining the liability of the truck owner for loss of the cargo by fire, the rental of a truck, together with a driver, did not constitute a lease under the circumstances presented in that case. It was held that although the driver may be under the direction of the hirer as to loading, character of cargo, destination and time of movement, the arrangement may nevertheless constitute a contract for hauling rather than a lease. There we quoted from the case of *John J. Casale, Inc.*, 4 Fed Carr Cas 356, par. 30,861 (1944) as follows:

> "'* * * Such instructions by shippers are incidental to any motor carrier service, both common and contract, and plainly do not constitute such control and direction over the trucks and drivers as to make the operation their own.'" 218 Or at 326.

And again:

> "'* * * Such practices are natural concomitants of any motor-carrier operation under which specified units of equipment are devoted exclusively to the needs of a particular shipper and do not necessarily imply direction and control by the shipper.'" 218 Or at 326.

See also, *Edward Hines Lumber Co. v. United States*, 239 F2d 488 (7th Cir 1957); *Interstate Commerce Com-*

*mission v. Werner,* 106 F Supp 497 (D.C.E.D. Ill 1951). In the instant case, the right of Elk Creek to designate load, destination, etc. would not, in itself, be sufficient to create a leasehold interest in the truck.

Another line of cases involving the applicability of federal statutes (I.R.C. 4271(a), 4272(a)) imposing a property transportation tax upon contract and common carriers, is helpful to our present inquiry. Under those statutes a lessee of equipment is not subject to the tax. The courts have been called upon in these cases to determine whether various arrangements constitute bona fide leases, absolving the user from the tax. In these cases the courts have used the same tests as those applied in the motor carrier cases. The leading case is *Bridge Auto Renting Corporation v. Pedrick,* 174 F2d 733 (2nd Cir 1949). We have alluded to the case involving the motor carrier application of John J. Casale, Inc. above; the same operations were the subject of inquiry under the tax statute in *John J. Casale, Inc. v. United States,* 86 F Supp 167, 114 Ct Cl 599 (1949), cert. den., 338 US 954, 70 S Ct 492, 94 L Ed 589 (1950). It was held that the lease was not bona fide. The court stated:

> "The taxing statute is not concerned with the form of the arrangements if the substance of the agreements or arrangements between the parties, when considered as a whole, add up to the transportation by one person of the property of another for hire, and we think that, in this case, the plaintiff's relations with those of its customers to whom it furnished both trucks and drivers, and the services by plaintiff to such customers, for the compensation agreed upon, were substantially those of a contract-carrier engaged in the business of transporting property for hire * * *." 86 F Supp at 168.

The fundamental consideration is well expressed in *Interstate Commerce Commission v. Werner,* supra, another tax case:

> "The issue of whether * * * carrier status * * * exists * * * is to be determined by how much service which goes with ordinary contract carriage * * * was being furnished by defendant * * * in addition to the leased vehicles; also whether on the whole a transportation service was being rendered by him * * * rather than simply furnishing for private operation the vehicles to [lessee], in the same manner as would normally obtain if [lessee] were the owner of the equipment." 106 F Supp at 500.

The manner of payment for the use of the motor vehicle has been deemed significant in determining the relationship of the parties. The fact that such payments are made in the same manner as payments for contract hauling is deemed a factor favoring a finding that a lease was not created. *U. S. v. LaTuff Transfer Service,* supra. On the other hand, a "rental" charge based upon time is a factor in favor of finding a lease. *Bridge Auto Renting Corporation v. Pedrick,* supra; *Ohio River Sand Co. v. United States,* 60 F Supp 563 (W. D. Ky 1945). But see, *Gulf Coast Towing Co. v. United States,* 196 F2d 944 (5th Cir 1952). In the case at bar the payments were made on the basis of the board feet hauled, which is the common measure of payment used in compensating independent truckers for transporting logs in this state.

The fact that Elk Creek carried Beckgren and Foglio on its books as employees and paid their salaries is a factor favoring the construction of the arrangement as a lease. It must be borne in mind, however, that the obligation to pay the drivers' wages could be simply a bookkeeping device with an adjustment

made in setting the price to be paid for hauling the logs. It has been recognized that such a device may be a mere subterfuge to hide the true character of the transaction. *Interstate Commerce Commission v. Werner,* supra.

The owner's obligation to repair and maintain the equipment used by the hirer has been regarded as evidence of a contract to haul rather than a lease. *Bridge Auto Renting Corporation v. Pedrick,* supra; *Gulf Towing Co. v. United States,* supra; *John J. Casale, Inc. v. United States,* supra; *Edward Hines Lumber Co. v. United States,* supra. And so with the owner's obligation to pay for the fuel used in the vehicles rented, *Bridge Auto Renting Corporation v. Pedrick,* supra; *Interstate Commerce Commission v. Werner,* supra; *Gulf Coast Towing Co. v. United States,* supra, or to furnish auxiliary equipment as to specially outfit for "lessee's" needs, *State (PUC) v. O. K. Transfer Co.,* 215 Or 8, 330 P2d 510 (1958); *Bridge Auto Renting Corporation v. Pedrick,* supra, or to provide garage facilities, *Interstate Commerce Commission v. Werner,* supra; *Bridge Auto Renting Corporation v. Pedrick,* supra; *John J. Casale, Inc. v. United States,* supra, and the fact that the "lessee" has no garage or service facilities, *Interstate Commerce Commission v. Werner,* supra. Also that "lessor" purchases insurance or license fees, *Bridge Auto Renting Corporation v. Pedrick,* supra; *Interstate Commerce Commission v. Werner,* supra, or obtains special hauling permits as needed, *State (PUC) v. O. K. Transfer Co.,* supra.

Foglio's obligation to pay overload fines is a factor of considerable significance. It should be clear that if the owner of log trucks is to assume this risk, he will concomitantly reserve the right to control the

weight of the loads to be hauled. Such right to control is more compatible with the idea that Foglio was an independent contractor furnishing a hauling service than with the idea that he was a lessor of equipment.

Finally, we point again to Foglio's understanding that he could substitute other trucks for those which were used in the Elk Creek operation. If the parties did so agree, it is difficult to square the arrangement with the concept of a lease; the lessee's possession of a truck in use would be, at best, a temporary and transitory control unlike the possession characterizing the usual lease or bailment relationship.

■ At the time defendant moved for a judgment notwithstanding the verdict he made an alternative motion for a new trial under the procedure provided for in ORS 18.140 (3). As one of the grounds for a new trial defendant recited the failure of the court to instruct the jury in accordance with defendant's requested instruction that before plaintiff could recover he must prove that defendant was an employer. The jury should have been instructed that Foglio could be held liable only if it were found that he was an employer within the meaning of the Employers' Liability Law, as we have described that status above.

■ Whether Foglio was a lessor of the trucks used by Elk Creek and, therefore, not an employer under ORS 654.305, or a contract hauler and subject to the Act as we have explained above, is a question which must be resolved by the jury. The judgment must, therefore, be reversed and the cause remanded for a new trial.

PERRY, J., dissenting.

The majority opinion in this case, it seems to me, misconstrues the Employers' Liability Law and thus

places a duty upon this defendant not contemplated by this enactment.

The facts in this case disclose that the defendant was not in any manner in charge of the loading of the trucks, and that the loading of the trucks and the manner in which it was done was entirely under the control of the Elk Creek Logging Company. Whether the trucks were to be loaded in the manner in which they were loaded or in some other manner and by devices that did not require plaintiff to be upon the truck were matters that rested within the discretion of the Elk Creek Logging Company. But the majority would read into the Employers' Liability Law a duty upon the owner and operator of the truck to provide a safe place for the plaintiff to jump in case the Logging Company's method of loading the truck developed trouble. I can find no language in the Employers' Liability Law, nor any prior interpretation of the Act, which would justify such a conclusion.

In my opinion, the use of workmen's compensation cases to define "persons having charge of, or responsible for, any work," as those words are used in the Employers' Liability Law, cannot in any way be used for analogy. The Employers' Liability Law is governed by tort law and implies a duty which, if not performed, creates a liability. Whereas, the rights of an injured employe under the Workmen's Compensation Act arises out of contract, *West et al. v. Kozer,* 104 Or 94, 206 P 542, and under the contract an injured employe is denied the right of action against a covered third party if there is a commingling of employes of different employers upon premises said to be under the employers' joint supervision and control.

Certainly, in interpreting the contract between the employer and the injured employe as created by the

Workmen's Compensation Act it becomes quite clear that the contract applies whether one employer has authority to direct the actions of another covered employer or not, *McGuire v. Brown,* 217 Or 300, 310, 342 P2d 774, or whether "only one of the covered employers may be said to be in actual control of the site where the work is under way." *Pruett v. Lininger,* 224 Or 614, 356 P2d 547, 551. Constructive control is all that is required, i.e., "* * * All that is essential is that they occupy the same premises and perform component parts of a general undertaking." *Inwall v. Transpacific Lumber Co.,* 165 Or 560, 571, 108 P2d 522, approved in *Hensler v. City of Portland,* 212 Or 28, 34, 318 P2d 313.

In the case before us, however, we are concerned with the specific duties an employer owes to the employe of another within the terms of the Employers' Liability Law. The majority state "The Act cannot apply unless in some sense the defendant has 'charge of' or is 'responsible for' the work out of which the injury arose. The defendant must participate in the enterprise in some way. The difficult problem is to determine what is meant by 'participation.'"

It seems to me that the use of the word "participation," which is general in its meaning, is, as used by the majority, a misnomer and tortures the plain, specific language of the statute. The participation which creates the duty and thus the liability is pointed out specifically therein and that is in being in "charge of" or "responsible for" the work being carried on.

It is hornbook law that an employer has a duty to provide employes with a safe working place and safe tools and appliances and that this duty cannot be avoided or delegated. *Celorie v. Roberts Bros., Inc.,* 202 Or 671, 681, 276 P2d 416; *Warner v. Synnes et al.,*

564

114 Or 451, 230 P 362, 235 P 305, 44 ALR 904. This duty is not shifted from the primary employer to another who comes upon the premises as an independent contractor to aid the employer in carrying on his business. *Wychgel v. States Steamship Co.*, 135 Or 475, 296 P 863; *Hicks v. Peninsula Lumber Co.*, 109 Or 305, 220 P 133.

Under the Employers' Liability Law an employer owes to his own employe the duty of providing not only a safe place to work, but also the duty to provide him with safe tools and other protective measures. ORS 654.305, ORS 654.310. Again the duty to see that this is done falls upon those "having charge of the particular work." ORS 654.315.

ORS 654.305 of the Act again refers to *"persons having charge of or responsible for,* any work involving risk or danger * * *."* (Italics supplied) This statute which is generally referred to as the "and generally" clause, and upon which plaintiff must ground his right to seek a recovery, reads as follows:

> "Generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving risk or danger to the employes or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

The statement "having charge of, or responsible for," is restrictive in meaning. It certainly does not go so far as to include one who as an owner or contractor is interested only in the end result of the work for which another is responsible. This is clearly

pointed out in the case of *Warner v. Synnes et al.,* supra, which is not mentioned in the majority opinion. In that case an employe of an independent contractor was injured by using a defective rope furnished by the owner. He sought, therefore, to hold the owner liable under the terms of the Employers' Liability Law. The complaint alleged:

> "That defendants and each of them were negligent herein in not furnishing the plaintiff a safe place to work and in requiring and allowing the use of an improper and unsuitable rope in the construction of said scaffold, and in failing to use every device and precaution for the protection of plaintiff \* \* \*." 114 Or 451, 455.

While "owner" is mentioned with equal force with other persons in the Act in denying recovery under the Act, the court said:

> "\* \* \* The reason for making the contractor alone responsible and exonerating the owner with whom he contracts is that the owner is not the *person in charge of the work.* \* \* \*" (Italics supplied) 114 Or 451, 458.

In the court's opinion on rehearing, the court stated:

> "\* \* \* It was part of the contract between Synnes, the contractor, and the company that the latter should furnish to Synnes and not to any of his employees the material necessary to be used. It was the duty of Synnes and not of the company to inspect this material and to see that it was proper and safe to be used. It was Synnes and not the company that could not delegate this duty to another. It is hornbook learning that the master is charged with the nondelegable duty of providing for his employees a safe place and safe appliances with which to work. \* \* \*" 114 Or 451, 462.

The court then went on and distinguished the cases of *Clayton v. Enterprise Electric Co.,* 82 Or 149, 161 P

411, *Turnidge v. Thompson,* 89 Or 637, 175 P 281, *Rorvik v. North Pac. Lumber Co.,* 99 Or 58, 190 P 331, and stated:

> "In all those cases the instrumentality of the defendant company which caused the injury was in active operation and directly affected the plaintiff * * *." 114 Or 451, 463.

From all this the court stated in that case and as shown in the following cases cited, the rule is that for an independent contractor to be held liable under the terms of the Act he must have the authority to direct the manner in which the work is being carried out, and becomes liable to the employe of another only when some instrumentality he is using sets in motion factors which result in an injury to that third person.

Mr. Justice McBRIDE, is speaking on the Employers' Liability Act, said: "The plain intent of the law is to give the injured employee a remedy against his employer." *Lawton v. Morgan, Fliedner & Boyce,* 66 Or 292, 300, 131 P 314, 134 P 1037. This was and is the primary purpose of the act and has been adhered to by this court, with the following exceptions as stated by Mr. Justice SLOAN in *Byers et al v. Hardy et al.,* 216 Or 42, 48, 337 P2d 806, and cited with approval in *Fisher v. Kirk,* 1008, 219 Or 402, 347 P2d 851:

> "The Employers' Liability Act makes no provision for a so-called third party action similar to that found in the Workmen's Compensation Act. *It is only the reference of risk and danger to 'the public'* (ORS 654.305) *which permits such an action to be brought at all.* This court has consistently held that it is not every member of the public that is thus protected. It is only those whose employment or duties require them to be about machinery of an employer other than his own or whose duties

may require such person to expose himself in or about hazardous conditions or structures of such other employer which are prohibited or circumscribed by the Act. *It must be a hazard or risk which the employer has created or permits to exist and which is within the control of the employer sought to be held.* There must likewise be a commingling of function or duty of the injured person and the employes of the employer. In other words, the acts or omission of the employer which give rise to a cause of action in behalf of an injured member of the public requires active and direct participation on the part of the employer. Turnidge v. Thompson, 89 Or 637, 175 P 281; Rorvik v. North Pac. Lumber Co., 99 Or 58, 190 P 331, 195 P 163; *Drefs v. Holman Transfer Co.,* 130 Or 452, 280 P 505; Myers v. Staub, 201 Or 663, 272 P2d 203." (Italics supplied)

It is quite apparent, if we assume the defendant was an independent contractor, that there was a "commingling of function or duty of the injured person" as an employe of the Elk Creek Logging Co., and the employes of the defendant. However, this commingling of employes by reason of the employers' contract, in my opinion, does not create a liability under the act insofar as the defendant is concerned.

The hauling of the logs by defendant was only a part of the over-all operation of the Elk Creek Logging Company. Therefore, it is necessary for the plaintiff to go further and show a violation of a duty toward the plaintiff as required by the act to be performed by the independent contractor. This duty has been spelled out by this court in *Turnidge v. Thompson,* supra, which opinion was analyzed in *Rorvik v. North Pac. Lumber Co.,* supra, 99 Or 58, 70, and stated as follows:

"* * * From the lucid interpretation in that

case [Turnidge v. Thompson] and in other cases hereafter mentioned, we deduce the rule that the Employers' Liability Act does not extend to the protection of the general public as such, but that it does extend its protection to employees of the particular person owning or operating dangerous machinery or engaged in hazardous employments, and *to other persons or employees of other corporations whose lawful duties require them to be or work about such machinery, or expose themselves to the hazards of the machinery or appliances in use by the owner thereof.*" (Italics supplied)

All of the cases involving an action against an independent contractor contain this same language or language of similar import. In an analysis of our cases, where the act has been interpreted to grant a cause of action to the employe of another, it has always been held that the machinery of the defendant was defective and, because defective, was the active cause of the injury. This is disclosed in the following cases where the act was interpreted to grant a cause of action to the employe of another which arises by reason of the reference in the act to risk or danger to the public.

In *Clayton v. Enterprise Electric Co.,* 82 Or 149, 161 P 411, the third party was held liable to the employe of another because the instrumentality operated and under the control of the defendant was not so guarded that when the employe came in contact with this instrumentality (electricity) the instrumentality caused his injury.

In *Rorvik v. North Pac. Lumber Co.,* supra, the defendant's cars, operating on rails, were not equipped with brakes so they could be held under control and on getting out of control caused the death of another's workman.

In *McKay v. Pacific Bldg. Materials Co.,* 156 Or 578, 68 P2d 127, the defendants, who were delivering cement to a contractor, used a defective safety chain on the tank holding the concrete so that when the defendant attempted to empty the tank by tipping it the chain broke and the tank fell upon the plaintiff.

In *Coomer v. Supple Investment Co.,* 128 Or 224, 274 P 302, the defendant left nails protruding in a structure so that they caught a chain and caused injury to the employe of another.

It, therefore, seems to me that the act requires of one, who is prosecuting work at or near or in conjunction with another, to safeguard his equipment so as to not cause injury to the employes of the other contractor. But when another has safeguarded his equipment, so that the equipment itself is not the activating cause of an injury to the employe of another, he has met the requirements of the act.

Stated in another way, one is not required to use every device, care and precaution for the safety of the employes of another unless the failure in this respect permits machinery and equipment under his control to actively and not passively cause injury.

To hold otherwise, it seems to me, would extend the act far beyond any proper interpretation. For instance, if we assume a state of facts which show that in this case the defendant is an independent contractor furnishing trucks for the loading of logs, and an employe of the Elk Creek Logging Company is required to stand by the truck to assist in guiding the logs so that they will be lowered in a proper position upon the truck; that during this operation the employe is compelled to jump toward the truck, because a log has slipped, and his head strikes the side of the truck injuring him; that it is further shown it is practical to

place protective material along the side of the truck, without interfering with the truck's operation, that would prevent such an injury. Under the interpretation of the act placed thereon by the majority, such injured workman of another would be within the protection of the act.

I would affirm the judgment of the trial court.

Justices ROSSMAN and WARNER concur in this dissent.